AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20) ☐ Original ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
4/29/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: cva DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
04/29/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: M.B. DEPUTY

United States of America

v.

PEDRO CUAHTEMOC ALVAREZ MARCELINO, aka "Pedro Alvarez," and ABRAHAN CONTRERAS-RODRIGUEZ,

Defendant(s)

Case No. 8:21-mj-00304-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of April 28, 2021 in the county of Orange in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | Possession with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Michael Rodriguez, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone

Date: 4-29-2021

Judge's signature

City and state: Santa Ana, California

Hon. John D. Early, U.S. Magistrate Judge
*Printed name and title*

AUSA: G. Kong 213-479-1743

**AFFIDAVIT**

I, Michael Rodriguez, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with the U.S. Immigration and Customs Enforcement, Homeland Security Investigations ("HSI") since August 2018. I have received extensive training in the methods and operations common to individuals and organizations that illegally import, possess, and distribute narcotics. I am currently assigned to the HSI Santa Ana Gang and Narcotics Investigations Group ("GNIG"). GNIG is made up of HSI agents who investigate criminal street gangs and other large-scale criminal organizations, such as drug-trafficking organizations, on both the street and transnational level.

2. Prior to joining HSI, I was a Police Officer for approximately 11 years with the Lansing, Illinois Police Department ("LPD"). As part of my duties at LPD, I was a Police Detective for approximately five years. I investigated criminal cases, which included homicide, robbery, burglary, and narcotics cases. I was also a Field Training Officer and part of my duty was to train new police officers to investigate narcotics cases. I hold a Bachelor's degree in Information Systems from Illinois State University.

3. I have specialized training and experience in investigations of narcotics trafficking and criminal street gangs. During my tenure as a Police Officer, as well as an HSI agent, I have conducted and participated in numerous

investigations of criminal activity, specifically including narcotics trafficking. I have personally been involved in the use of electronic and physical surveillances, the use of informants, undercover operations, and the preparation and execution of arrest and search warrants.

## II. PURPOSE OF AFFIDAVIT

4. This affidavit is made in support of a criminal complaint against Pedro Cuahtemoc ALVAREZ MARCELINO ("ALVAREZ") and Abrahan CONTRERAS-RODRIGUEZ ("RODRIGUEZ") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute 50 Grams or More of Methamphetamine) on or about April 28, 2021.

5. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. STATEMENT OF PROBABLE CAUSE

6. Beginning in January 2021, HSI and the Costa Mesa Police Department ("CMPD") initiated an investigation into a potential drug trafficking target, later identified as ALVAREZ.

This investigation utilized a confidential informant[1] ("the CI") who was able to make contact with potential drug traffickers.

    7.    Beginning on February 3, 2021 and continuing to February 26, 2021, ALVAREZ and his associate, RODRIGUEZ, sold narcotics, specifically methamphetamine and fentanyl pills, to the CI and a CMPD undercover police detective (the "UC"). The transactions detailed below were video/audio recorded, with the exception of the February 26, 2021 transaction, which was only audio recorded – due to a malfunction with the covert video recording device. I know the following based on my personal observations, database queries, speaking with the CI and the UC, and reviewing the recordings of the transactions. All conversations that occurred during the below detailed transactions and meetings with the targets occurred in the Spanish language. I relied on the UC's recollection and English translation of the events since I do not speak Spanish.

---

[1] The CI involved in this investigation cooperates in exchange for United States immigration benefits, as well as monetary gain. The CI has been paid as part of this investigation. The CI has provided truthful and credible information related to this investigation as well as previous investigations. A criminal records checks revealed the following information: In July 2007, the CI was convicted of possession of controlled substances for sale. In 2012, the CI was arrested/detained for a local ordinance violation in Garden Grove, CA. In 2017, the CI was arrested by Customs and Border Protection for an alien inadmissibility charge while attempting to enter the United States at a port of entry and was sent back to Mexico. The CI was able to gain entry back into the United States due to having a valid issued parole card, which would legally allow entry at CBP's discretion. The CI was detained by Customs and Border Protection for a similar instance in June 2020, but was again able to make legal entry back into the United States.

8. On or about January 19, 2021, the CI notified me that he had potentially identified a subject, known as "Pedrito," who was a potential source of narcotics. The CI told me that he had met a subject at a restaurant and discussed drug trafficking. The subject told the CI that he knew Pedrito, a methamphetamine trafficker. The subject gave Pedrito's phone number to the CI. The CI contacted Pedrito (later identified as ALVAREZ) and set up a meeting on January 26, 2021 to discuss a narcotics transaction.

9. On January 26, 2021, the CI along with the UC went to the Ramada Hotel located in Costa Mesa, CA for their scheduled meeting with ALVAREZ. ALVAREZ met with the CI and UC outside at that location. ALVAREZ advised the UC and CI that he had access to large amounts of fentanyl, heroine, oxycodone pills, and methamphetamine. ALVAREZ said he recently traveled to different states to drop off drugs and collect money. ALVAREZ provided the UC with a free "sample" of methamphetamine. The sample of suspected methamphetamine weighed approximately 5.57 grams. ALVAREZ quoted the UC a price of $1500 per pound of methamphetamine, with a discount to $1400 per pound if they purchased at least five pounds. ALVAREZ told them that he had a warehouse in Los Angeles where he stores his narcotics. The meeting was covertly video/audio recorded.

10. After the meeting, utilizing law enforcement databases, a California driver's license was located for ALVAREZ. The UC positively identified the person he met as ALVAREZ.

February 3, 2021 Undercover Purchase of Methamphetamine from ALVAREZ

11. The CI set up another meeting with ALVAREZ for February 3, 2021 to purchase approximately five pounds of methamphetamine, at the price of $1400 a pound. The following events occurred on February 3, 2021 and resulted in ALVAREZ selling approximately 454 grams of methamphetamine to the UC and CI:

   a. At approximately 1:00 pm, the CI met with law enforcement officers to discuss the buy operation. I provided the UC with HSI funds to purchase the methamphetamine from ALVAREZ. The deal was to take place at a Home Depot store parking lot in Costa Mesa, CA.

   b. At approximately 1:35 pm, the CI and the UC arrived together at the Home Depot store. Prior to arriving, the UC turned on a hidden video/audio recorder on his person. The UC parked in a parking stall located on the north side of the Home Depot's parking lot and waited for ALVAREZ to arrive. Prior to arriving, ALVAREZ called the CI and told him that he only had one pound of methamphetamine because he had sold the rest to a different person. The UC agreed to buy the one pound from ALVAREZ. After several minutes, ALVAREZ called the CI and told him he had arrived. ALVAREZ arrived driving a white Honda sedan with no valid registration displayed. ALVAREZ parked directly next to the UC's vehicle.

   c. The UC and CI exited their vehicle and met with ALVAREZ. ALVAREZ apologized for not having the five pounds of

methamphetamine and said he would get more in two to three days. ALVAREZ opened the trunk and retrieved a red shoe box. ALVAREZ opened the shoe box, which contained a pair of jeans. ALVAREZ removed the jeans from the shoe box and the UC was able to see a clear plastic bag containing a large amount of suspected methamphetamine. ALVAREZ gave the box containing the methamphetamine to the CI. The CI walked over to the UC's vehicle and opened the rear passenger door. The CI placed the box containing the methamphetamine on top of the rear passenger seat and instructed the UC to look at it. The UC entered the backseat of the vehicle and examined the suspected methamphetamine. The UC confirmed that the bag weighed approximately one pound.

   d. The UC walked over to the CI and ALVAREZ and confirmed the price with ALVAREZ. ALVAREZ agreed to $1,400.00 for the pound. The UC gave ALVAREZ $1,400.00 cash. The UC told ALVAREZ that he was interested in buying 1,000 counterfeit oxycodone pills. ALVAREZ agreed. The UC told ALVAREZ he would have the CI reach out to him to set up the deal in the near future.

   e. ALVAREZ also said that he was going to make a phone call to see if he could drop off the remaining four pounds. ALVAREZ said he would let the UC know if he was able to get the remaining four pounds later in the day. The UC and the CI returned to their vehicle and left the area. ALVAREZ also left the area.

   f. Approximately five minutes later, ALVAREZ called the CI saying he was going to pick up the four pounds and meet them in about two to three hours. The UC agreed. ALVAREZ and the UC agreed to meet at a Walmart store. Later, ALVAREZ called the CI and stated that he was not able to get the four pounds.

  12. The suspected methamphetamine was sent to the U.S. Customs and Border Protection ("CBP") laboratory for analysis. I received a report from the CBP laboratory with the following result: The net weight of the sample is 446.07 g. Confirmatory analysis indicates the white crystals contain methamphetamine hydrochloride. Analysis of the white crystals from the sample indicates the sample has an overall methamphetamine hydrochloride purity of 99.6% by weight, with an uncertainty of +/- 1.0% at the 95% confidence level.

<u>February 10, 2021 Undercover Purchase of Methamphetamine from ALVAREZ and RODRIGUEZ</u>

  13. Following the deal, the CI and ALVAREZ agreed to meet on February 10, 2021 for another methamphetamine buy. The following events occurred on February 10, 2021 and resulted in ALVAREZ's associate, later identified as RODRIGUEZ, selling approximately 891 grams of methamphetamine to the UC and CI:

   a. The CI and ALVAREZ agreed to meet at 1:00 pm at the El Calamar restaurant located at 315 W. 17th Street, in Santa Ana, CA, for another methamphetamine buy.

   b. At approximately 12:00 pm, the UC and CI met with law enforcement officers to discuss the buy operation. I

provided the UC with HSI funds to purchase the methamphetamine from ALVAREZ.

   c. At approximately 12:38 pm, the UC and CI drove together to the El Calamar restaurant and went inside the restaurant. ALVAREZ sent a text to the CI to let him know that his cousin instead was going to meet with them. Then the UC observed a Hispanic male and a Hispanic female walk into the restaurant. Based on surveillance, the subjects arrived at the location in a red Volkswagen vehicle with California registration 8JZK140. The UC later identified the male as RODRIGUEZ and the female as E.L. based on their California Department of Motor Vehicles photographs.

   d. After RODRIGUEZ and E.L. entered the restaurant, RODRIGUEZ walked over to the UC's and CI's table and asked the CI for his name. The CI confirmed his name and greeted RODRIGUEZ. The CI invited RODRIGUEZ and E.L. to sit down with them to eat. RODRIGUEZ and E.L. agreed. Once RODRIGUEZ sat down, the CI asked RODRIGUEZ for his name. RODRIGUEZ introduced himself as "Abraham [Abrahan], I'm Pedro's cousin."

   e. RODRIGUEZ stated that he only had two pounds of methamphetamine. RODRIGUEZ mentioned that the methamphetamine had a strong odor of acetone and that it had a brown color. The UC asked RODRIGUEZ if the methamphetamine was brown because it was inside of a gas tank. RODRIGUEZ said he did not believe the quality was not good. RODRIGUEZ explained that they get large shipments of methamphetamine, and as soon as they get the methamphetamine, they sell it.

f.  RODRIGUEZ, E.L., the CI, and the UC ordered food and began conversing. RODRIGUEZ and E.L. asked what car the UC and CI were driving and walked out before them. RODRIGUEZ and E.L. entered the red Volkswagen Golf (CA 8JZK140) that was parked near the entrance of the restaurant. RODRIGUEZ drove his vehicle towards the UC's vehicle.

g.  Once RODRIGUEZ parked, E.L. remained in the vehicle while RODRIGUEZ, holding a white plastic bag, exited the vehicle. RODRIGUEZ handed the bag, which contained the suspected methamphetamine, to the CI. The CI opened the front passenger door of the UC's vehicle and sat down inside to examine the methamphetamine. The UC was standing directly next to the CI as he examined two clear plastic bags in the bag that contained the suspected methamphetamine.

h.  Once the UC confirmed the bags contained the suspected methamphetamine, the UC confirmed the price with RODRIGUEZ who said it was going to be "14" ($1,400.00) for each pound. The UC paid RODRIGUEZ $2,800.00 cash for approximately two pounds of methamphetamine. After he paid RODRIGUEZ, the UC informed RODRIGUEZ that he was interested in buying the "M30's" (Oxycodone pills). RODRIGUEZ said to let him know if they needed anything else. RODRIGUEZ said, "As soon as they enter, he can let you guys know." The UC understood that to mean that ALVAREZ would let them know when he had the pills available. The CI and UC entered the UC's vehicle and left the area. The meeting and transaction was video/audio recorded by the UC.

14. The suspected methamphetamine was sent to the CBP laboratory for analysis. I received a report from the CBP laboratory with the following result: The net weight of the crystals are 445.02 g (Bag A) and 446.10 g (Bag B). Confirmatory analysis indicates the white crystals contain methamphetamine hydrochloride. Analysis of the white crystals from bags A and B indicates the sample has an overall methamphetamine hydrochloride purity of 95.1% by weight, with an uncertainty of +/- 1.0% at the 95% confidence level.

February 17, 2021 Undercover Purchase of Methamphetamine from ALVAREZ

15. Following the deal, the CI set up a future meeting with ALVAREZ on February 17, 2021 to purchase additional methamphetamine. The following events occurred on February 17, 2021 and resulted in ALVAREZ selling the CI approximately 889 grams of methamphetamine:

   a. The CI was in contact with ALVAREZ who agreed to meet the CI and the UC at 1:00 pm, at the Norms restaurant, located at 102 E. 17th Street, in Santa Ana. At approximately 12:00 pm, I met with the CI, the UC, and other law enforcement to discuss the safe execution of the "buy-walk" operation with ALVAREZ. I provided the UC with HSI funds to purchase two pounds of methamphetamine from ALVAREZ.

   b. At approximately 12:31 pm, the UC and CI drove to the Norms restaurant. Prior to arriving, the UC turned on his CMPD issued hidden video/audio recorder. Once they arrived, the UC and CI walked to the restaurant and waited for ALVAREZ to

arrive. At approximately 12:55 pm, ALVAREZ sent the CI a message stating that he was nearby. Shortly thereafter, ALVAREZ arrived and parked at the Norms parking lot. CMPD detectives and I parked near the Norms restaurant and conducted surveillance. After several minutes, ALVAREZ advised the CI that he had arrived. The CI asked ALVAREZ to walk inside the restaurant and join them. ALVAREZ refused and said that he was going to go to the gas station to fuel up his car. The CI told ALVAREZ that they would meet with him shortly.

       c.    The CI and UC went to their vehicle and waited for ALVAREZ to arrive. A few minutes later, ALVAREZ arrived driving the same white Honda sedan that was previously seen. ALVAREZ parked next to the UC's vehicle. The UC was able to see that ALVAREZ was driving and there was an unknown Hispanic male in the front passenger seat.

       d.    Once ALVAREZ parked, ALVAREZ exited his vehicle and walked up to the front passenger window of the UC's vehicle. The CI and UC remained inside of their vehicle. They greeted ALVAREZ who immediately asked about the two pounds they had previously bought from RODRIGUEZ. The CI and UC told ALVAREZ that the two pounds were of poor quality. ALVAREZ said that the two pounds that his cousin sold them were brown because they had been wrapped with coffee.

       e.    ALVAREZ walked back to his vehicle, reached inside, and grabbed a white plastic bag containing the two pounds of suspected methamphetamine. ALVAREZ handed the bag to the UC through the open passenger window. ALVAREZ said the

methamphetamine was covered in oil. The CI and UC opened the bag and saw two large bundles wrapped in saran wrap. The saran wrap was covered in what appeared to be and smelled like engine oil.

       f.    The UC told ALVAREZ that he wanted to buy "M30" (oxycodone) pills. ALVAREZ said he did not have any right now. ALVAREZ asked how many the UC wanted to buy. The UC told ALVAREZ that he wanted to buy one thousand pills. ALVAREZ asked if he had a good customer that could buy the pills from the UC. The UC informed ALVAREZ that he could sell the "M30" pills for about $15.00 each pill.

       g.    The UC handed ALVAREZ $2,800.00 cash for the two pounds of suspected methamphetamine. ALVAREZ got in his vehicle and drove away from the area. The UC and CI also drove away from the area concluding the operation.

    16.    The suspected methamphetamine was sent to CBP laboratory for analysis. I received a report from the CBP laboratory with the following result: The net weight of the crystals are 445.58 g (Bag A) and 443.70 g (Bag B). Confirmatory analysis indicates the white crystals contain methamphetamine hydrochloride. Analysis of the white crystals from bags A and B indicates the sample has an overall methamphetamine hydrochloride purity of 99.7% by weight, with an uncertainty of +/- 1.0% at the 95% confidence level.

    <u>February 26, 2021 Undercover Purchase of Fentanyl Pills from ALVAREZ and RODRIGUEZ and Discussion of More Methamphetamine Buy</u>

17.  Following the deal, the CI and UC met with ALVAREZ and RODRIGUEZ on February 26, 2021 to purchase fentanyl pills.  The following events occurred on February 26, 2021 and resulted in ALVAREZ and RODRIGUEZ selling about 1000 fentanyl pills, with an approximate net weight of 106.93 grams, to the CI and UC:

    a.  The CI was in contact with ALVAREZ who agreed to meet the CI and UC at 3:00 pm in Huntington Beach, CA.

    b.  At approximately 2:00 pm, the UC met me, Huntington Beach Police Department (HBPD) detectives, and CMPD detectives to discuss the safe execution of the "buy-walk" operation with ALVAREZ.  I provided the UC with HSI funds to purchase the fentanyl pills from ALVAREZ.

    c.  On or about 2:20 pm, the UC drove to the Walgreens store, located at 19501 Beach Blvd, in Huntington Beach.  Prior to arriving, the UC turned on his video and audio recording devices.  The UC later discovered that his video recording device failed to record, and only an audio recording of the operation existed.

    d.  Once the UC arrived at the area of the Walgreens store, he met with the CI and waited for ALVAREZ to arrive.  ALVAREZ had contacted the CI earlier in the day and requested that they meet him at a Home Depot store in Santa Ana.  The CI advised ALVAREZ that he could not meet in Santa Ana and requested he meet them at the Walgreens store.  ALVAREZ agreed.

    e.  ALVAREZ later arrived driving his same white Honda Accord.  The UC and CI exited their vehicle and walked over to ALVAREZ's vehicle, parked directly next to them.

ALVAREZ rolled down the driver's side window and the rear driver's side passenger window. The UC observed that ALVAREZ was driving, and RODRIGUEZ was sitting in the front passenger seat. The UC greeted both ALVAREZ and RODRIGUEZ.

    f. ALVAREZ handed the UC a small purple plastic bag with the words, "White Runtz", written on it. The UC asked ALVAREZ if the bag contained the 1000 pills. ALVAREZ said it did. The UC then asked ALVAREZ if they had counted the pills. ALVAREZ replied, "We counted them already." The UC opened the bag and saw a large amount of blue pills with "M" on one side and the number "30" on the other side.

    g. The UC asked ALVAREZ if the pills were "good." ALVAREZ told the UC to be careful because the pills were strong. The UC handed ALVAREZ $3,200.00 which was the agreed upon price for the pills. ALVAREZ took the money and began counting it. ALVAREZ also asked RODRIGUEZ to help him count the money. After ALVAREZ and RODRIGUEZ counted the money and confirmed the entire amount, ALVAREZ asked if they wanted to buy more methamphetamine. The CI asked ALVAREZ if he was willing to come down on the price. ALVAREZ said the lowest he could do was $1,400.00 per pound.

    h. ALVAREZ further stated that he had access to large amounts of fentanyl. ALVAREZ said he would sell a "brick" (one kilogram) of fentanyl for $24,000.00. The UC told ALVAREZ that he would be interested in buying half a kilo. ALVAREZ said he had another customer who is interested in buying the other half of the kilogram.

i. ALVAREZ opened the glove compartment in his vehicle and removed a Narcan nasal spray. ALVAREZ told the UC that the pills can kill you and explained how the Narcan nasal spray worked. ALVAREZ said the pills he had just sold him contained high levels of fentanyl. ALVAREZ then told the UC that he sold counterfeit pills to a Caucasian male who consumed a pill in front of him. According to ALVAREZ, the Caucasian male overdosed right in front of him and ALVAREZ had to use the Narcan to prevent the male from dying.

j. ALVAREZ gave the UC a small marijuana plant and a beer as gifts before leaving the area. After ALVAREZ left the area, the UC disposed of the beer and later disposed of the marijuana plant at the CMPD.

18. The suspected fentanyl pills were sent to CBP laboratory for analysis. I received a report from the CBP laboratory with the following result: 992 round blue tablets stamped with M on one side and 30 on the other. The net weight of the blue tablets was 106.93 g. Confirmatory analysis indicates the blue tablets contain fentanyl. In the lab's opinion, the sample also contains 4-ANPP. Fentanyl and 4-ANPP are Schedule II controlled substances under 21 C.F.R. Part 1308. In the lab's opinion, three out of the five analyzed blue tablets also contain tramadol, a Schedule IV controlled substance under 21 C.F.R. Part 1308.

<u>April 28, 2021 Undercover Meeting with ALVAREZ and RODRIGUEZ to Purchase Approximately 22 Pounds of Methamphetamine and Subsequent Arrests</u>

19. Following the deal, the CI was in contact with ALVAREZ who agreed to meet with the CI and UC on April 28, 2021 in Costa Mesa to sell approximately 22 pounds of methamphetamine. ALVAREZ agreed to meet the CI and UC at the Home Depot store, located at 2300 Harbor Blvd., Costa Mesa, CA.

20. On April 28, 2021, at approximately 4:00 pm, ALVAREZ notified the CI that he had arrived. HSI agents, CMPD detectives, and I were in the area conducting surveillance. The UC and CI arrived at the parking lot of Home Depot. Prior to arriving, the UC turned on his video/audio recorder.

21. ALVAREZ arrived a short time later and parked next to the UC's vehicle. The UC and CI exited the vehicle and met with ALVAREZ. Shortly after, RODRIGUEZ arrived and parked next to the UC's vehicle. Once RODRIGUEZ arrived, ALVAREZ asked the UC if he wanted to see the methamphetamine and began to walk towards RODRIGUEZ's vehicle. The UC followed and opened the back passenger door of RODRIGUEZ's vehicle. The UC greeted RODRIGUEZ and shook his hand. The UC saw a gray duffle bag in the rear passenger seat. The UC opened the bag and saw a large amount of clear plastic bags containing suspected methamphetamine. The UC examined several of the bags and placed them back inside the duffle bag. The UC used a key phrase to allow law enforcement, who was listening in, to know that he had observed the suspected methamphetamine.

22. The UC told ALVAREZ that he was going to get the money and began to walk back to the UC's vehicle. Law enforcement officers then arrived and detained ALVAREZ, RODRIGUEZ, and a

male passenger seated in ALVAREZ's vehicle (later identified as E.A.). ALVAREZ, RODRIGUEZ, and E.A. were later transported to the CMPD jail for booking.

23. The suspected methamphetamine was weighed at CMPD in its packaging. There were about 24 bundles, weighing approximately 10.82 kilograms, or 23.85 pounds. The suspected methamphetamine is stored at CMPD and will be sent to CBP laboratory for analysis. Based on my training and experience, which includes observing methamphetamine, I submit that there is probable cause to believe that the narcotics taken during the undercover operation and subsequent arrests are in fact methamphetamine.

24. I attempted to interview ALVAREZ and RODRIGUEZ, but after reading their Miranda Rights, ALVAREZ requested a lawyer and RODRIGUEZ stated that he did not want to speak with me.

//

//

## IV. CONCLUSION

25. For all the reasons described above, there is probable cause to believe that ALVAREZ and RODRIGUEZ violated 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute 50 Grams or More of Methamphetamine).

.

/s/
_____
Michael Rodriguez, Special Agent
Homeland Security Investigations

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 29th day of
April, 2021.

_____
HONORABLE JOHN D. EARLY
UNITED STATES MAGISTRATE JUDGE